11 So.2d 521

**STATE ex rel. LOUISIANA SAV. BANK & TRUST CO. v. BOARD OF SUP'RS OF LOUISIANA STATE UNIVERSITY et al.**

No. 36684.

Dec. 30, 1942.

John H. Tucker, Jr., of Shreveport, Lewis L. Morgan, of New Orleans, and Benj. B. Taylor, of Baton Rouge, for defendants-appellants.

Frymire & Ramos, C. L. Stiffell, and Lautenschlaeger & Lautenschlaeger, all of New Orleans, for plaintiffs-appellees.

FOURNET, Justice.

The Louisiana Savings Bank and Trust Company, as the holder and owner for value before maturity of twenty-two 5½% Serial Revenue Bonds, Series "C," of the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College, invoked the provisions of Section 13 of the act authorizing the issuance of said bonds (Act No. 68 of 1934), seeking to coerce, by way of mandamus, the Board of Supervisors, its chairman, vice-chairman, secretary, and comptroller, to pay the past due interest 'coupons of said bonds and also to pay the bonds and remaining coupons in due course.

In response to the rule nisi issued in the matter, the respondents filed (1) an exception to the jurisdiction of the court ratione personae, and, in the alternative, ratione materiae; (2) exceptions of no right and no cause of action; and (3) an answer. The basis of the exceptions, as well as the defense on the merits, is that the bonds are null and void in that (a) they were issued in violation of Act No. 6 of the Second Extra Session of 1935, and (b) they were delivered without the authority of the Board of Supervisors, as required by the act authorizing their issuance.

The trial judge, after hearing evidence on the exceptions, overruled them. The case was then submitted by agreement of counsel for a decision on the merits on the evidence that had been adduced on the trial of the exceptions. There was judgment in favor of the relator making the alternative writ of mandamus peremptory and commanding the Board of Supervisors and its officials, who were sued individually, to pay the past due interest coupons and bonds, and, further, to pay the bonds and remaining coupons when they become due. From this judgment, the respondents have appealed.

The Legislature of the State of Louisiana, by its Act No. 68 of the regular session of 1934, authorized the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College to borrow a sum sufficient to pay an indebtedness previously incurred by the university (Section 1), and, in evidence of said loan, authorized the Board, in Section 2, to issue bonds in an amount not to exceed $530,000. It is stipulated in the act that the bonds "shall be negotiable," and that "title to such bonds shall pass by proper transfer on the books of the University." Section 3, subsection (a). The act further provides "That the issue of said bonds * * * is hereby declared to create a valid contract between the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College and each and every holder of said bonds, which the said Board of Supervisors shall not impair" (Section 8), and that "the holder * * * of any bond * * * issued under this Act shall have the right to writs of mandamus * * * to enforce compliance with any provision of this Act * * *." Section 13.

On August 22, 1934, the Board of Supervisors of the Louisiana State University and Agricultural and Mechanical College, acting under the authority of this act, adopted a resolution authorizing the issuance of bonds in the sum of $300,000. They were designated 5½% Serial Revenue Bonds, Series "C," to be dated June 1, 1934, and conditioned to bear interest at the rate of 5½% per annum, payable semi-annually, on June 1 and on December 1. The bonds were to be signed by the Governor of the State of Louisiana, as ex-officio President of the Board of Supervisors, and by the President of the university, as ex-officio Secretary of the Board. One hundred and nineteen of these bonds were sold; only ninety of these were outstanding at the time of the trial of this case.

At its Second Extra Session of 1935, the Louisiana Legislature adopted its Act No. 6 wherein it was provided "That *hereafter no * * * public board, political or public corporation * * * or any other * * * political or public corporation,* created under or by the Constitution and laws of the State of Louisiana, *shall have authority to borrow money, incur debt, or to issue bonds * * * without the consent and approval of the State Bond and Tax Board, created by Section 3 of this Act.*" Section 2. (Italics ours.)

It appears that twenty of these bonds (Nos. 121 to 140, both inclusive) were originally purchased on April 3, 1936, by Leon Weiss, for which, according to the books of the university, he paid $20,000. Two other bonds (Nos. 164 and 165) were acquired by Mrs. James Monroe Smith on March 3, 1937, for the cash consideration of their par value, plus accrued interest. These twenty-two bonds were subsequently acquired by James Monroe Smith, then the university's president, and it was from him that the relator purchased them for an amount in excess of their par value, plus the accrued interest. The Board of Supervisors of the university paid the interest on these bonds regularly on December 1 and June 1 of each year up to the time the bonds were

acquired by the relator, and continued making such payments until the maturity of the semi-annual interest coupons following the exposure of irregularities in connection with the university, in which its president was involved. Then, for the first time, payment was refused and the validity of these bonds contested.

The trial judge, in his written reasons for judgment, accurately stated the issues of the case, and, in disposing of the same, gave an able and thorough analysis of the pertinent facts and the law applicable thereto. We therefore quote with approval from his opinion the following:

"The defendants admit that if June 1, 1934, be the date of the issuance of the bonds, Act 6 of the Second Extra Session of 1935 can not apply; in other words, that it was not necessary to have the consent of the State Bond and Tax Board for their sale and delivery. On the other hand however, defendants claim that if the date of sale and delivery is legally the date of the issuance of said bond, the said Act of 1935 does apply to the bonds here involved and that the authorization conferred upon the Board to execute, sell and deliver these bonds contained in Act No. 68 of 1934 was modified by the Act of 1935 to the extent that the consent of the State Bond and Tax Board was necessary for their validity.

"The bonds held by relator having been originally acquired after the effective date of the Act of 1935, defendants claim that the same are irregular, illegal, null and void and that there is no obligation on the part of the defendant Board to pay the past due interest.

"It can not be denied that generally speaking State bonds or bonds lawfully issued by State agencies, if valid in their inception, are usually held to be negotiable securities, and as such, subject to the same rules of law governing negotiable instruments. They must be transferred by endorsement and delivery, and if made payable to bearer, they are transferable by delivery.

"In Corpus Juris, Vol. 59, Section 420, page 276, we find the following:

"'States which issue such negotiable paper incur the same responsibilities which attach to individuals or corporations in a like case. Hence subject to the rules hereinafter stated, they are binding on the state in the hands of innocent holders for value. If such securities are issued by competent authority, they are, in the hands of bona fide holders, unaffected by the circumstances by which they were put into circulation; since states issuing such paper must necessarily do so through the instrumentality of officers or agents, the only inquiry is whether the officer or agent has been intrusted with authority to make or issue the paper, not his conduct in making the issue. If the officer or agent has been guilty of irregularity or even frauds in exercising the power with which he has been intrusted, the loss occasioned thereby must fall on the party who intrusted him with such power and not on the innocent purchaser who has taken the paper in the usual course of trade.'

"Here relator represents that the twenty-two bonds referred to in its petition were acquired in the usual course of business for

value and before maturity; and the evidence shows that, aside from obtaining the consent of the State Bond and Tax Board (if that was necessary), every other necessary step as to their regularity and legality was taken.

"There is not a line of testimony in the record to show that relator bank knew that these particular bonds did not leave the University's possession until after the year 1935, or the circumstances under which the University parted with the same.

"Apparently the bank officials receiving the same merely looked at their date, and considering them to be marketable bonds, accepted the same.

"Relator's position therefore, is that a purchaser of an instrument negotiable on its face will not and should not be subjected to the obligation of ascertaining whether the same was authorized by the State Bond and Tax Board, when the instrument on its face, bears a date preceding the creation of such Board and when the instrument expressly recites that all acts, conditions and things required to exist, to happen and to be performed precedent to the issuance of the instrument, exist, have happened and have been performed in due time and in accordance with existing statutes. Relator's counsel in their brief point out that it would be unusual and unheard of to require one about to purchase a negotiable State bond dated say in 1900, to know when that particular bond was first delivered and put into circulation and to know the circumstances surrounding its sale and original delivery. Yet they say that if defendant's contention is sustained this burden will be imposed with disastrous consequences.

"Relator further contends that the issuance of these bonds was expressly authorized by the Legislature itself, regardless of when they were sold and delivered, and that no further authorization was necessary, particularly the authorization of a Board which the Legislature itself created, and which the Legislature has the power to abolish.

"Learned counsel for defendants have quoted from certain decisions in other jurisdictions to support their contention that a bond is issued when it is delivered, regardless of its date. Among these decisions are Brownell v. Town of Greenwich, 114 N.Y. 518 [22 N.E. 24, 4 L.R.A. 685]; Perkins County, Neb., v. Graff [8 Cir.] 114 F. 441; Steinbruck v. Milford Tp., 100 Kan. 93, 163 P. 647.

"Defendants also cite the case of Mouton et al. v. City of Lafayette, decided by the Supreme Court of Louisiana and reported in 178 La. 1041, 152 So. 751 [753], in which is found the following language:

"'We agree with the district judge that a tax levied to pay bonds which have not been issued, even though the issue has been authorized by a vote of the property taxpayers, is premature.'

"Counsel further quote from Vol. 22 of the Permanent Edition of Words and Phrases 698, citing the case of Brownell v. Town of Greenwich, 114 N.Y. 518 [22 N.E. 24, 4 L.R.A. 685], the following:

"'In an action against a town to recover on bonds "issued" by it, the court said the

bonds were presumed to have been executed at the time they bear date; but executing is not issuing, for they might·be fully executed, but never issued. The bonds had no legal conception, and could not become valid obligations until actually delivered for a valuable consideration, and the delivery of the bonds determines the date when the bonds were issued.'

"Again, they quote from the syllabus of the case of Perkins County, Neb., v. Graff, supra, as follows:

" 'The verb "issue" means to emit or send forth, and it does not embrace the preliminary acts of signing and dating, but is confined to the delivery of bonds.'

"From Vol. 22 of the Permanent Edition of Words and Phrases, 698, citing Steinbruck v. Milford Tp., 100 Kan. 93, 163 P. 647, we quote:

" 'Municipal bonds are not issued until they are sent out, delivered, or put into circulation.'

"In further support of their position, learned counsel for defendants refer the Court to the case of Walmsley v. Resweber, 105 La. 522, 30 So. 5; Roberts v. Bauer, 35 La.Ann. 453; Huber v. Jennings-Heywood Oil Syndicate, 111 La. 747, 35 So. 889; Phelan v. Wilson, 114 La. 813, 38 So. 570; Hammond State Bank & Trust Company v. Broderick, 179 La. 693, 154 So. 739; Palmer v. Mayor, et al., 195 La. 997, 197 So. 697; State National Bank v. Board of Commissioners of Port of New Orleans, 121 La. 269, 46 So. 307; Ozenne v. Board of Commissioners of Gravity Drainage Dist. No. 1 of St. Landry and St. Martin, 183 La. 465, 164 So. 247.

"I have carefully read all of the Louisiana cases cited by learned counsel in support of the proposition that the date of the sale and delivery of a bond is the date of the issuance thereof, and while it will be conceded that a number of these cases point strongly in that direction, none of them are decisive of the exact question here presented.

"In Words and Phrases, Permanent Edition, Vol. 22, page 699, we find the following: .

" ' "In financial parlance the term 'issue' seems to have two phases of meaning. 'Date of issue,' when applied to notes, bonds, etc., of a series, usually means the arbitrary date fixed as the beginning of the term for which they are to run, without reference to the precise time when convenience or the state of the market may permit of their sale or delivery. When the bonds are delivered to the purchaser, they will be issued to him, which is the other meaning of the term." Yesler v. City of Seattle, 25 P. 1014, 1019, 1 Wash. 308; Gage v. McCord [5 Ariz. 227] 51 P. 977, 979.'

"In the same volume of Words and Phrases, we find the following:

" 'Word "issued," within constitutional amendment providing that bonds for moneys for state buildings shall be issued by, state board of fund commissioners, held to authorize such board to sell bonds,' citing State ex rel. State Building Commission [v. Smith], 74 S.W.2d 27, 29, 335 Mo. 840.

"Again, quoting from Love v. Mayor and Board of Aldermen of Yazoo City [166 Miss. 322] 148 So. 389, we find in the same

volume of Words and Phrases, the following:

" 'The term "issue" has various meanings, depending on the subject-matter of the writing or discourse, or upon the context, or both, and context should always be considered in reaching interpretation of "issue" in a given case.'

"The last syllabi in the case of State National Bank v. Board of Commissioners of the Port of New Orleans, 121 La. 269, 46 So. 307 [308], reads as follows:

" 'The date of the issue of the bonds and coupons is not necessarily the date that it was found convenient or advantageous to sell them.'

"In that case the Supreme Court, quoting from Yesler v. [City of] Seattle, 1 Wash. 308, 25 P. 1014 [1019], said:

" 'In financial parlance the term "issue" seems to have two phases of meaning. "Date of issue," when applied to notes, bonds, etc., of a series, usually means the arbitrary date fixed as the beginning of the term for which they run, without reference to the precise time when convenience or the state of the market may permit of their sale or delivery * * *. When the bonds are delivered to the purchaser, they will be "issued" to him, which is the other meaning of the term.'

"With reference to the distinctions made in Yesler v. [City of] Seattle, the Supreme Court of Louisiana in State National Bank v. Board of Commissioners of the Port of New Orleans, said:

" 'We understand in large finance (in matter of government finance, for instance), the date of the bonds is generally referred to as the date of the issue of the bonds, as the bonds of a certain year, because they all bear the date of that year. For that reason it is safe enough to conclude that the first meaning given in the decision from which the quotation is taken is the correct meaning in a case such as we have now before us, in which all the parties up to the date of the sale must have acted on the hypothesis that they had a right to issue bonds and coupons bearing the same date as forming part of the instruments offered for sale.'

"There can be no doubt that the Legislature by Act No. 68 of 1934 unequivocally authorized the issuance of the bonds here involved. See Section 2 of said Act.

"These and other bonds of the same series were issued for the payment of the construction cost of certain buildings, the payment of pre-existing debts and the cost of additional facilities.

"The Board of Supervisors was especially authorized to negotiate and dispose of these bonds. See Section 4 of Act No. 68 of 1934.

"The issue of said bonds was declared to create a valid contract between the Board and each and every holder of said bonds which the Board can not impair, and said bonds when issued, were made valid obligations of said Board in favor of any holder. See Section 8 of said Act.

"In these circumstances, the question arises as to whether or not even though the Act of 1935 was in effect when these par-

ticular bonds were sold, it was necessary to obtain the consent of the State Bond and Tax Board to consent to the sale thereof.

"The Legislature itself had already in recognition of outstanding debts of the University which had to be paid, and in further recognition of the need of additional facilities, authorized the issuance of these bonds. It would seem therefore, that even if the Act of 1935 was effective as of that date, which it undoubtedly was, it could not have been intended to and did not repeal the provisions of the Act of 1934 in which the Legislature itself conferred upon the University Board the right to issue and sell these bonds. If this be true the technical question as to just when a bond is issued is of relative unimportance.

"The Act of 1935, in my opinion, did not have reference to the sale of bonds the issuance of which had previously been expressly authorized by the Legislature. It is true that in Section 7 thereof it is provided that the provisions of the 1935 Act apply to any debt incurred or bond or other evidence of debt issued by any governmental agency named in Section 2 of the Act. The governmental agencies there named are any 'parish, municipality, public board, political or public corporation, subdivision, or taxing district,' etc. These and other taxing districts named are under the Act denied the authority to borrow money, incur debt, or to issue bonds etc. 'without the consent and approval of the State Bond and Tax Board.'

"It will be conceded that had it not been for the special authority specially con-

ferred upon the University Board by the Act of 1934, the provisions of the 1935 Act would apply.

■ "However, in view of that authority which presumably, was granted by the Legislature after due consideration of the necessity thereof, I can not believe it was intended that a Board created by the Legislature should be vested with any discretionary authority to pass upon the question of whether said bonds could be issued or whether the issuance of the same was wise or unwise, notwithstanding the language (contained in Section 2), 'where they are authorized by the Constitution or laws of the State of Louisiana so to do.' *To hold otherwise would be to recognize the power of the State Bond and Tax Board to veto an act of the Legislature.* (Italics ours.)

■ "After all, what was the purpose of the requirement of the consent of the State Bond and Tax Board? Obviously, to prevent the issuance of fraudulent bonds or bonds improperly secured or improperly authorized and perhaps to minimize the burden of local taxes. If the advisability of the issuance of these bonds had been presented to the State Bond and Tax Board what question would such Board have been called upon to pass on? It seems to me that all questions which such Board would ordinarily have the right to consider had already been considered and passed upon by the Legislature.

■ "Again, after a bond issue as a whole has been legally confected, I do not believe the issuing Board could be

said to be required to get the consent of the State Bond and Tax Board to the sale of every individual bond on or before the date it was actually sold. It would be a strange situation to say that some bonds of a given issue were legal and others not when all were executed by virtue of the same act of the Legislature.

"Again, when the consent of the State Bond and Tax Board is required, in my view the consent required is to the whole issue rather than to particular bonds of an issue.

"My conclusion is, therefore, that even if learned counsel for defendants are correct in their contention that a bond is not 'issued' until it is delivered, the bonds here involved did not have to be submitted to the State Bond and Tax Board for approval before delivered as sufficient authority for their execution, sale and delivery had been granted by the Legislature in 1934, which authority was neither revoked nor modified by the Act of 1935.

"The evidence thus far taken discloses that relator acquired these bonds in good faith, for value before maturity. They were made negotiable by the Legislature itself which decreed that they should constitute a valid contract between the University Board and the holders thereof. I see no merit in the contention that these bonds were issued without the authorization of the Board of Supervisors. The resolution of this Board offered in evidence refutes this charge.

"It may be true that the Board as a whole did not know to whom each sepa-

rate bond was sold and did know that the President of the University had delivered these particular bonds to the persons who originally acquired them, nor what the consideration of the delivery thereof was. These facts, however, did not affect the negotiability of the bonds or render the sale thereof by one apparently clothed with authority to dispose of them illegal. All such Boards necessarily act through officers. If these officers are unfaithful, the penalty for such unfaithfulness should not, in my opinion, be imposed upon an innocent third holder who acquired the same at a price above par."

For the reasons assigned, the judgment appealed from is affirmed.

McCALEB, J., concurs with written reason.

ROGERS, J., absent.

McCALEB, Justice (concurring).

It seems to me that the proposition advanced by the defendant in this case is fully disposed of by the fact that the particular issue of bonds, which is the subject of this contest, was duly authorized by Act No. 68 of 1934, at a time prior to the creation of the State Bond and Tax Board by Act No. 6 of the Second Extra Session of 1935.

Section 2 of Act No. 6 of the Second Extra Session of 1935 provides: "That hereafter no * * * public board, political or public corporation * * * or any other * * * political or public cor-

poration, created under or by the Constitution and laws of the State of Louisiana, *shall have authority to borrow money, incur debt, or to issue bonds * * * * without* the consent and approval of the State Bond and Tax Board, * * * *". (Italics mine).

The word "hereafter", as above used, plainly discloses the intention of the Legislature that the Act was to operate prospectively and was not to apply to any debt or liability which had been previously incurred by any public subdivision or to any issue of bonds which had been theretofore authorized. The fact that the bonds in the instant case were not issued in the sense that they had not been actually delivered to the holder prior to the passage of Act No. 6 of the Second Extra Session of 1935 is of no moment since the issuance of the bonds was fully authorized by a special act of the Legislature at a time previous to the enactment of that statute.

For the foregoing reason, I am of the opinion that the case was correctly decided by the trial judge. However, I entertain considerable doubt with respect to the soundness of the judge's view that the holder in due course of a negotiable bond issued by the State, or any of its subdivisions, is to be accorded the same protection which is given to the holder of a negotiable instrument or other commercial paper issued by private individuals or corporations.

Therefore, I respectfully concur in the decree.